THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MORRIS MALINSKI and SIDNEY RUDISH, Appellants.

Argued January 17, 1944; decided April 20, 1944.

*David F. Price* and *Joseph Solovei* for Morris Malinski, appellant. I. The confession of Malinski should have been excluded; its admission presents material and prejudicial error requiring a reversal of the judgment of conviction. (*People* v. *Pantano,* 239 N. Y. 416; *People* v. *Pignataro,* 263 N. Y. 229.) II. The lawless practice of police officers in failing to comply with the procedure set forth in section 165 of the Code of Criminal Procedure has been condemned. (*People* v. *Doran,* 246 N. Y. 409; *People* v. *Cohen,* 243 App. Div. 245; *People* v. *Mummiani,* 258 N. Y. 394; *People* v. *Alex,* 265 N. Y. 192; *People* v. *Elmore,* 277 N. Y. 397.) III. The court should reverse the judgment herein, emphasizing the influence that the illegal conduct of the police has in its action, and condemn the conduct of the District Attorney for approving this illegal police action. This court should proclaim a rule that henceforth all confessions obtained from persons illegally detained in custody be excluded and this rule rigidly enforced. (*McNabb* v. *United States,* 318 U. S. 332; *Anderson* v. *United States,* 318 U. S. 350.) IV. The guilt of defendant Malinski was not established beyond a reasonable doubt. (*People* v. *Crum,* 272 N. Y. 348; *People* v. *Goldberg,* 281 N. Y. 855; *People* v. *Lewis,* 275 N. Y. 33; *People* v. *Becker,* 210 N. Y. 274; *People* v. *Davino,* 288 N. Y. 423; *People* v. *Feolo,* 284 N. Y. 381; *People* v. *Ledwon,* 153 N. Y. 10.) V. The witnesses Yellin and Spielfogel are both accomplices as a matter of law. The finding that Spielfogel was not an accomplice is contrary to the evidence and against the weight of the evidence. (*People* v. *Sweeney,* 213 N. Y. 37; *People* v. *Cohen,* 223 N. Y. 406; *People* v. *Clougher,* 246 N. Y. 106; *People* v. *Swersky,* 216 N. Y. 471; *People* v. *Zackowitz,* 254 N. Y. 192; *People* v. *Kress,* 284 N. Y. 452.) VI. The witness Kovner was an accomplice and the court erred when it charged the jury that Kovner is not either in law or in fact an accomplice. (*People* v. *Rosenthal,* 289 N. Y. 482; *People* v. *Walker,* 198 N. Y. 329.) VII. Appellant Malinski was entitled to a fair trial. The trial which he received is a reproach to the administration of justice. (*People* v. *Malkin,* 250 N. Y. 185;

*People* v. *Zackowitz,* 254 N. Y. 192; *People* v. *Richardson,* 222 N. Y. 103; *People* v. *Russell,* 266 N. Y. 147; *People* v. *Kress,* 284 N. Y. 452; *People* v. *Wolf,* 183 N. Y. 464; *People* v. *Ferguson,* 245 App. Div. 837; *People* v. *Elbroch,* 250 App. Div. 583; *People* v. *Esposito,* 224 N. Y. 370; *People* v. *Johnson,* 284 N. Y. 182; *Viereck* v. *United States,* 318 U. S. 236.) VIII. The court erred in its charge to the jury to the prejudice of appellant Malinski. (Code Crim. Pro. § 393A; *People* v. *Rakiec,* 289 N. Y. 306; *People* v. *Minnaugh,* 131 N. Y. 563; *People* v. *Breen,* 181 N. Y. 493; *People* v. *Stern,* 201 App. Div. 687; *Matter of Eno,* 196 App. Div. 131; *People* v. *Weiss,* 290 N. Y. 160.)

*John J. Fitzgerald, Julian V. Carabba* and *Saul M. Meadow* for Sidney Rudish, appellant. I. The indictment was a nullity. It was found on the uncorroborated testimony of an accomplice. There was no corroborating testimony connecting the defendant Rudish, with the crime. The motion of said defendant, to dismiss the indictment because based only upon the uncorroborated testimony of an accomplice, should have been granted. Its denial is reversible error. (*People* v. *Nitzberg,* 289 N. Y. 523; *People* v. *May,* 158 Misc. 488; *People* v. *Willett,* 213 N. Y. 368; *The People* v. *D'Argencour,* 95 N. Y. 624; *People* v. *Wiechers,* 179 N. Y. 459; *People* v. *Sweeney,* 213 N. Y. 37; *People* v. *Glen,* 173 N. Y. 395; *People* v. *Sexton,* 187 N. Y. 495; *United States* v. *Coolidge,* 2 Gallison 393; *People* v. *Walsh,* 262 N. Y. 140; *People ex rel. Lemon* v. *Supreme Court,* 245 N. Y. 24; *People ex rel. Hirschberg* v. *Supreme Court,* 269 N. Y. 392.) II. The witnesses Yellin and Spielfogel are both accomplices as a matter of law. The finding that Spielfogel is not an accomplice is contrary to the evidence and against the weight of evidence. There was no evidence against the defendant Rudish, except that of accomplices, and it was reversible error to deny the motion to direct a verdict in favor of said defendant. (*People* v. *Sweeney,* 213 N. Y. 37; *People* v. *Cohen,* 223 N. Y. 406; *People* v. *Clougher,* 246 N. Y. 106; *People* v. *Swersky,* 216 N. Y. 471; *People* v. *Zackowitz,* 254 N. Y. 192; *People* v. *Kress,* 284 N. Y. 452; *People* v. *Demasco,* 240 N. Y. 170; *People* v. *Ledwon,* 153 N. Y. 10.) III. The guilt of defendant Rudish, was not established beyond a reasonable doubt. The verdict of guilty as to Rudish was contrary to the evidence and against

the weight of evidence. (*People* v. *Crum*, 272 N. Y. 348; *People* v. *Weiss*, 290 N. Y. 160; *People* v. *Kress*, 284 N. Y. 452; *People* v. *Malkin*, 250 N. Y. 185; *People* v. *Slover*, 232 N. Y. 264; *People* v. *Manganaro*, 218 N. Y. 9; *People* v. *Watson*, 216 N. Y. 565; *Viereck* v. *United States*, 318 U. S. 236; *People* v. *Lewis*, 275 N. Y. 33; *People* v. *Becker*, 210 N. Y. 274; *People* v. *Feolo*, 284 N. Y. 381.) IV. The confession of defendant Malinski, should have been excluded, as a matter of law. Its admission was highly prejudicial to defendant Rudish. It was a denial of " due process " under the Fourteenth Amendment to the Constitution of the United States, and section 6 of artcile VI of the State Constitution, and requires the reversal of the judgment as to him. (*People* v. *Mummiani*, 258 N. Y. 394; *People* v. *Elmore*, 277 N. Y. 397; *People* v. *Alex*, 265 N. Y. 192; *People* v. *Cohen*, 243 App. Div. 245; *People* v. *Trybus*, 219 N. Y. 18; *People* v. *Doran*, 246 N. Y. 409; *McNabb* v. *United States*, 318 U. S. 332; *People* v. *Barbato*, 254 N. Y. 170; *People* v. *Weiner*, 248 N. Y. 118; *People* v. *Kelly*, 264 App. Div. 14.) V. The trial court's charge was inadequate in several respects. The failure more fully to instruct the jury regarding the Jalkover and Shamin incidents, the testimony of Holingsworth, as to Spielfogel's status as an accomplice, and as to the duty of the police to arraign the defendants without unnecessary delay after arrest, all constitute reversible error. (*People* v. *Odell*, 230 N. Y. 481; *People* v. *Fanning*, 131 N. Y. 659.)

*Thomas Cradock Hughes, Acting District Attorney* (*Henry J. Walsh* of counsel), for respondent. I. The indictment is not a nullity. An indictment as a court record imports absolute verity until properly impeached and the presumption attaches that it was based upon legal and sufficient evidence in the absence of satisfactory proof to the contrary. (*People* v. *Nitzberg*, 289 N. Y. 523; *People* v. *Sweeney*, 213 N. Y. 37; *People* v. *Glen*, 173 N. Y. 395.) II. Spielfogel was not an accomplice as a matter of law and the court properly left his status to the jury. (*People* v. *Swersky*, 216 N. Y. 471.) III. Malinski's confession was properly received in evidence. (*People* v. *Doran*, 246 N. Y. 409; *People* v. *Mummiani*, 258 N. Y. 394; *People* v. *Alex*, 265 N. Y. 192; *People* v. *Poulin*, 207 N. Y. 73; *People* v. *Smith*, 180 N. Y. 125; *People* v. *Rimieri*, 180 N. Y. 163.) IV. Other

Rudish contentions with respect to Malinski's confession as it affected Rudish and the Jalkover and Shamin '' incidents '' are unfounded. V. The trial court's charge was adequate in all respects.

CONWAY, J. The two defendants and one Joseph Indovino were convicted of the crime of murder in the first degree. As to Indovino, the jury recommended life imprisonment and his case is not now before us.

The deceased, Leon Fox, was a police officer of the city of New York who was accompanying the manager of a theater to a branch bank in Coney Island so that the receipts of the day might be deposited in the bank receptacle provided for that purpose. The tragedy occurred at about 11 o'clock at night and, since the date was February 15, 1941, and the scene on Surf Avenue in Coney Island, there was practically no one abroad. As the police officer and the manager proceeded toward the bank they neared an automobile which was parked on one of the streets running at right angles to and facing Surf Avenue. One door was open and the front lights had been extinguished. As they passed it, a man jumped from the car, knocked the manager down and shot the officer. The manager dropped the bag upon command, after attempting to run with it. It was picked up and the automobile drove off. The police officer fired some six shots after the departing automobile as he lay upon the sidewalk. None of the robbers was identified by anyone. Those within the neighborhood testified to the speed and the quick departure of the automobile. One witness did say that he heard in all five or seven shots; that an automobile shot past; that there were three men in it; that the two men in front were short men; that the driver looked as if he could not reach the pedals of the car; that the man in the rear of the car was thin with hair slicked back and that he was bent over.

Ten months passed.

In December of the year of the murder two men were sentenced to a State prison for robbery committed while armed. One of them was David Yellin. He received a sentence of from ten to twenty years. The other, committed three days later in connection with the same crime, was Nathan Spielfogel. He received a sentence of from thirty to sixty years. Spielfogel

was the intimate of the defendant Malinski. He was married. As an outgrowth of his intimacy with Malinski and of their criminality together, he and Malinski had agreed that if one went to prison the other would contribute to the support of the family of the one incarcerated. Malinski broke that agreement after partial performance of it.

At the State's prison at Sing Sing Spielfogel ate with a convict named Kovner. Kovner had never known Spielfogel or Yellin before meeting them in Sing Sing. He was intimate, however, with Malinski and Indovino and his close companion was one Ebbie Beitler. Kovner testified that whenever Beitler was in the city the two of them were inseparable. We shall return to Beitler later. Suffice it to say at this point that it was Beitler who gave the signal which led to the shooting of Fox and that Kovner had been with Beitler when the latter was subsequently engaged in an affray in a New York hotel in which Beitler shot one man, attempted to shoot a policeman and then committed suicide. That had occurred on October 28, 1941, and it was thereafter that Kovner was sent to Sing Sing and became one of the trio composed of Yellin, Spielfogel and Kovner.

That was the setting as we approach the end of the second ten-month period succeeding the murder of Fox.

On October 23, 1942, in the early morning, the defendant Malinski was arrested and brought to a leading hotel in Brooklyn and lodged in a room there. Spielfogel was brought to the same hotel. On the following day the defendant Rudish and Indovino were arrested and brought to the hotel. On that same day David Yellin was brought there from Sing Sing prison. Thereafter Malinski, Rudish and Indovino were indicted and put upon trial.

On that trial David Yellin, testifying as a witness, said that on the Tuesday or Wednesday preceding the day of the murder he met Indovino on First Street and Avenue A in Manhattan. He said that Beitler called to him, introduced him to Indovino and asked him to take a message to Spielfogel. The message was that Indovino, the finger man, had a " cinch job " (crime) which could be done at Coney Island and which involved the manager of a theater who took the receipts of the theater to

a bank in a neighborhood where there was no one about. When they had finished talking Beitler told the witness to see Spielfogel and tell him that he (Beitler) wished him to join in the commission of the crime and to give to Spielfogel the details. It was there stated that the receipts should total about $1,000. As a matter of fact that estimate was but $230 too high. Indovino stated that he would not go himself because he was too well known in Coney Island. Yellin carried the message that night to Spielfogel but the latter said that he would not take part in anything in which Indovino was concerned. We shall return to the testimony of Yellin later but shall now proceed chronologically with the testimony of others.

Nathan Spielfogel, whose nickname was Slip, testified for the People that Yellin had brought to him Beitler's message and that he was not interested so long as the crime had been suggested by Indovino. He said that Beitler met him the next day and that he again told Beitler that he didn't wish to join with him. He said that Beitler then asked if it was all right to use the " pieces " (guns). Spielfogel testified that he told Beitler that he would have to ask Malinski. He testified, " I says, ' Those " pieces " don't belong to me '. I told him, ' Malinski — it is up to Malinski. If he wants to give you them, they are yours. I got no part of them " pieces "; they are all Malinski's.' * * * I said, ' Those " pieces " don't belong to me. They are all Malinski's " pieces ". If he gives them to you, you got them.' " Beitler was interested because the " pieces " were large ones. Apparently there were then seven guns at the store in which Malinski worked. Spielfogel testified that on the following Saturday he had four guns in his possession and put them in the store but again denied that they were his.

Then occurred the robbery and murder, to the circumstances of which reference has already been made. Following it and at about 1:30 A. M. on the morning of February 16th, Malinski arrived at Spielfogel's home without hat or coat. He said he had left his coat at the club but that he had dropped his hat — Hershee's hat — when he jumped from the automobile when abandoning it. Hershee was one Harry Levine who had given Malinski a hat. A hat had been found under the automobile used in the robbery which had been abandoned on Stillwell

Avenue about a block and a half from Surf Avenue. The hat so found, later initaled by Malinski during a confession to which reference will be made, fitted Malinski when he was required to put it on while testifying or the jury could so have found.

Spielfogel said that after he provided Malinski with another hat, they went to the Citadel Club where Malinski talked over the crime which had been committed. He said that he met the defendant Rudish in Manhattan at about 9 o'clock and that they picked up Beitler on Houston Street and then drove to Coney Island. They visited a restaurant and then placed the automobile in position near the bank. Beitler stayed on the corner and gave Malinski a signal when the manager and the police officer were approaching. The shooting then occurred. They abandoned the automobile after going a few blocks and Beitler and Malinski took first one cab and then another back to Manhattan. Beitler then told Malinski to go to the club with the money while he went to the store of his aunt and disposed of the guns which had been used. Rudish was to come by train and when all three finally arrived at the club the money was divided. There was a dispute there, at the time of the division of the money, as to the conduct of the robbery, Malinski insisting to Spielfogel that he had done all that he was supposed to do as planned beforehand; that Beitler was supposed to take the money while he (Malinski) " took the cop ", whereas Rudish and Beitler were insisting that it had been arranged for Malinski to take the money.

In the course of that conversation as detailed by Spielfogel from the witness stand, Malinski said that he had used the " pieces " which Red Tiplet had taken from a locker uptown and he identified them as two .38 calibre pistols and two of .45 calibre and that he and Beitler had each fired two shots. Digressing for a moment and bearing in mind that this story was told by Spielfogel in October of 1942 (he was brought to the city from Sing Sing on October 15, 1942), nearly twenty months after the commission of the crime, it is interesting to note that the District Attorney brought to the trial one Simon Eisler who, at the time of the trial, was a corporal in the United States Army stationed at Tacoma in the State of Washington and who had never been convicted of any crime nor charged

with any crime. The testimony of that man as distinguished from that of the convicts who gave testimony against Malinski undoubtedly had great weight with the jury and was very damaging to Malinski. Eisler's nickname was Red Tiplet (a red pigeon). When he gave his testimony he had been in the Army since January 20, 1941, a period of about two and one half years. He entered the Army therefore about twenty-five days before the murder. He had known the defendant Rudish for fifteen years and the defendant Malinski for about three years. He testified that in the latter part of December, 1940, he had a talk with Malinski at the Citadel Club and that Malinski gave him a ticket to pick up a package in the Terminal and to bring it down to the club. Malinski gave him four dollars and he went uptown, picked the package up and brought it back to the club. Malinski opened it and in the package he saw four pistols: two fountain pen guns and two pistols of .38 calibre. The two .38 calibre pistols were wrapped in stockings. He was asked: " Q. In addition to the fountain pen guns and the two .38's, did you see any other object in the package? A. There were more stockings, but I don't know what was in them." The corporal said that when he obtained the package he had not known what was in it. He also said that he did not know the defendant Indovino. He had known Yellin all his life and he knew Spielfogel and had gone to school with Beitler. At the time of the errand, he lived on the east side of Manhattan about half a block away from the Citadel Club. Curiously enough the witness had never told Spielfogel nor Yellin nor any police officer about the errand on which Malinski had sent him until he was brought from Tacoma on June 12, 1943, a distance of 3,000 miles, five days before he testified on June 17, 1943. It would seem clear that the information as to Eisler could only have come to the District Attorney from Malinski through Spielfogel to Yellin or Kovner in Sing Sing.

We now return to Malinski and Spielfogel at the Citadel Club in those early morning hours after the murder. After leaving the club they went to a restaurant and then to the store where Malinski worked. There the latter left the change in silver which had been taken in the robbery. Then they went to the home of a sister of Malinski where he wished to stay rather than to return to Brooklyn for fear his parole officer

might appear. Spielfogel testified that he went in the kitchen of that apartment, took a drink of water and walked back into the hall. A few minutes later he heard Malinski say, '' Go back to bed.'' The two separated at about 4 o'clock that morning.

Again despite the lapse of twenty months as already indicated, the People put upon the stand the brother-in-law of Malinski and the girl in whom Malinski was interested and who was living at that time with Malinski's sister and her husband. Malinski's brother-in-law, Pietro Di Pisa, testified that Malinski came to his home about 1:30 or 2 o'clock in the morning of Sunday, February 16, 1941; that Malinski said he had shot a cop in Coney Island and that he had $200 in his pocket; that Malinski talked to the young girl, Jean Goonan, in the kitchen and that he heard Malinski say to her, '' If you don't go back to bed there I give you the same dose as I give the cop.'' Di Pisa said that he ordered Malinski out. Malinski's sister did not testify in denial of any of this. Di Pisa said that he had not talked with anyone from the police department or from the District Attorney's office until the Tuesday preceding the day on which he testified.

Jean Goonan testified that she was living with the Di Pisas; that on the Sunday morning at about 2:30 she was awakened by a banging on the door and that Malinski came in. She heard him tell his sister that he had shot a cop and that they had obtained about $200 each as a result; that she asked him, '' What did you do; shoot a cop? '' and that Malinski said, '' Get back in bed before I give you the same thing I gave the cop.''

We take now the case against Rudish. On February 14, Spielfogel said he talked with Rudish in Manhattan. Rudish asked why Spielfogel was not taking part in the robbery and Spielfogel told him that he didn't like it. Again on Saturday afternoon Rudish made the same inquiry and Spielfogel said that it was because he didn't like the tipster. Rudish then said that he, Malinski and Beitler were going to meet at 9 o'clock that night. On Sunday when Rudish met Spielfogel in the afternoon he said that Malinski had '' balled everything up. All he knows how to do is to throw a couple of shots.'' Rudish said that he had gone to Brooklyn to look for Spielfogel's uncle, whose address Spielfogel had given him the day before

in connection with another matter, but had lost the address; that when it was near 9 o'clock he stole the first car he saw and picked up Malinski on 8th Street and Beitler on Houston Street in the Borough of Manhattan. He said that after the robbery, he abandoned the car and went up on the Stillwell Avenue railroad station. He told Spielfogel that it sounded as though all the sirens in New York were in Coney Island. He said they obtained about $220 each and that Malinski received $20 extra because two of his guns were used.

Samuel Kovner, whom we have mentioned before as the convict who ate at Sing Sing prison with Spielfogel, testified that about five days before the murder while accompanied by Beitler he met Malinski and Indovino. Indovino talked of " a piece of work " at Coney Island. Indovino asked Beitler and Kovner whether they cared to undertake it. Kovner took Beitler aside and they talked and then Beitler told Indovino that Kovner was not interested because there was a cop in it. Indovino said he could not go because he was known in Coney Island and Beitler said he would look for a third man. Kovner next saw Beitler and Indovino about the 21st of February, six days after the murder. Indovino then asked Beitler for money. He saw him again two days later. Then Indovino was complaining that Beitler was too quick; that he did not have to shoot the policeman; that it would have been sufficient to put the gun against his back. A few days later he heard Indovino again asking Beitler for money.

In general that was the case presented against the defendants by the People, apart from a four day confession by Malinski which we have not considered, and there was sufficient there if believed to justify the conviction of the defendants of murder committed during a robbery. Counsel have urged upon us, however, that it was error for the court to submit to the jury the confession made by Malinski orally on October 23rd, by word and deed on October 25th and 26th and to an Assistant District Attorney and a stenographer in the early morning hours of October 27th. It is urged that the confession should have been excluded for two reasons. *First* that the defendant Malinski was not arraigned promptly before a magistrate and *second* that the confession was obtained by fear produced by threats and assault.

Perhaps, it will be helpful before discussing the law as to those two contentions, if we quote the following in the words from the brief of counsel for Malinski in recounting Spielfogel's testimony: " That while Malinski was being questioned by the District Attorney he talked to Malinski which was about two weeks after he was brought down from Sing Sing. This took place in the Hotel Bossert. Malinski asked one of the lieutenants if he could speak to Spielfogel but the witness would not talk to Malinski. The police officers all said ' Go over and see what he wants ' so he and Malinski went into the next room and Malinski said that he knew they had Jake [Rudish] in the next room and that they knew too much already; that he might as well go out there and tell them the rest. That he told Malinski that he was over twenty-one and Malinski then told the lieutenant he would tell the truth but did not want to go to the chair. The lieutenant promised Malinski nothing, saying ' This is a police case. You will have to take your chance,' and Malinski said he would ' like to bring in a Rabbi or a fellow by the name of Nat Math ' ' ".

The latter was an Assistant District Attorney. Permission was refused Malinski to see either a rabbi or Mr. Math and he then confessed. That was on Friday, the day of his arrest. It was on the following day, after that confession, that the defendant Rudish and Indovino were arrested.

We shall first consider the question whether, when a prisoner is not brought before a magistrate without unnecessary delay, following his arrest, a confession obtained after such unnecessary delay is admissible at all or must be excluded. This Court has given earnest consideration to that problem in the past and has resolved it in favor of the admission of the confession to be followed by an instruction that it must be disregarded if obtained through fear produced by threats and that, in reaching a conclusion thereon, the jury may take into consideration the circumstance that the confession was obtained while arraignment was illegally delayed. (*People* v. *Mummiani,* 258 N. Y. 394; *People* v. *Alex,* 265 N. Y. 192.) It seems to us that applicable and convincing reasoning leading to that conclusion was declared with clarity in *People* v. *Defore* (CARDOZO, J., 242 N. Y. 13, 23, 24, 25). We need not quote at length.

There are a few sentences which indicate the reasoning. ". We are confirmed in this conclusion when we reflect how far-reaching in its effect upon society the new consequences would be. The pettiest peace officer would have it in his power through overzeal or indiscretion to confer immunity upon an offender for crimes the most flagitious. * * * We may not subject society to these dangers until the Legislature has spoken with a clearer voice. * * * The question is whether protection for the individual would not be gained at a disproportionate loss of protection for society. On the one side is the social need that crime shall be repressed. On the other, the social need that law shall not be flouted by the insolence of office. There are dangers in any choice. The rule of the *Adams* case strikes a balance between opposing interests. We must hold it to be the law until those organs of government by which a change of public policy is normally effected, shall give notice to the courts that the change has come to pass." We have made our choice.

It is next urged upon us that the confession should have been excluded *as a matter of law* because when Malinski was brought to the hotel he was stripped to see if there were any evidences of bullet wounds in view of the fact that the deceased officer had fired after the automobile, following the shooting, and because there was some evidence that at least one shot had struck the car. The stripping of Malinski for that purpose was concededly proper but complaint is made because he was left in his underwear for the greater part of the first day of his stay at the hotel. Malinski said that he was subjected to physical violence. The testimony as to the violence was not very strong. He said among other things that he was struck twice by a lieutenant and once by another police officer, " but not too hard " by the latter. " Not hard enough to throw me over. I was sitting in one of the armchairs." His lips were not cut; his nose did not bleed; his mouth bled on the inside. Such was Malinski's testimony. He did not complain to the prison doctor because he " didn't have no injuries." There was no testimony as to violence except by Malinski. Neither Rudish nor Indovino claimed to have been assaulted although in the same hotel with the same officers. Neither of them confessed to the police or District Attorney. Whether the confession

therefore was induced by fear produced by threats and violence was for the jury to determine. They weighed his testimony as to the violence and they considered the fact that he was compelled to spend most of one day clothed in his underwear and a blanket and the excuse of the police that that was a way to prevent escape in the hotel. Whether these latter circumstances would produce fear so that a man would confess his crime would depend a great deal upon the type of man involved. We do not think it can be held *as a matter of law* that it brought about such fear that the confession followed. All those questions it seems to us were for the jury which saw Malinski and heard him. They were in a position to judge from his appearance and attitude what effect depriving him of his outer clothing would have upon him.

It is next urged upon us that the Assistant District Attorney gave his views as to the reason why Malinski was left in his underclothes and we are asked to reverse because of that. The three defendants on trial were represented by experienced counsel. It is true the Assistant District Attorney made the statements quoted in the dissenting opinion. The summation covers sixty-three printed pages. The first quotation is twenty-nine pages before the second. The District Attorney was interrupted by counsel fourteen times. Nearly all of those objections were made by the attorney for Malinski. Yet no interruption by objection was made to the remarks quoted. That is no excuse for the remarks but it is some indication of the fact that none of the counsel took them seriously. The remarks were indefensible. Whether under the circumstances a new trial should be ordered for Malinski because of these disconnected and disjointed utterances which at the time of their utterance brought not a single one of the counsel to his feet to make objection, is a matter of judgment. Our judgment is that the verdict should stand and be affirmed. Even apart from the fact that it did not appear important enough to counsel to cause them to register an objection immediately, the effect of the utterances it seems to us would inure to the benefit of Malinski rather than against him and they did not relate to Rudish or Indovino.

When we have spoken of Malinski's confession we include, of course, not only the confession made orally to a police officer

on the Friday night of the arrest but also the two automobile trips on Sunday and Monday, one to the police garage to permit Malinski to identify the automobile used in the crime and the other to Coney Island to revisit a restaurant and the scene of the crime, and the confession to the District Attorney which was taken stenographically in the early morning of Tuesday, October 27th.

On the question of arraignment without unnecessary delay the court charged as follows: "Lieutenant McNally claims that he was willing to arraign Malinsky before a Magistrate on the very day, namely, Friday, when Malinsky was first brought to the Bossert, but that Malinsky stated that he would rather stay at the hotel with his friend Spielfogel than be thrown into a cell in a police station.

"Be that as it may, I charge you that it was the duty of the police to arraign the defendant before the nearest Magistrate without unnecessary delay, and, further, that if a police officer failed or refused to perform such duty, he is guilty of a misdemeanor.

"But, gentlemen, you will bear in mind that the police department is not on trial in this case. This testimony was adduced solely on the question as to whether or not the alleged confession later made was the result of the coercion, either direct or implied, which is prohibited by the statute, and which invalidates a confession if made. If you should find that the arraignment of the defendant was delayed, you may consider that on the question of the voluntariness of any confession made by Malinsky, including the one made in the early hours of October 27th at the Bath Beach station house."

On the question of whether the stenographically transcribed confession of Malinski to an Assistant District Attorney should be accepted by the jury, the court charged as follows: "Although Malinsky does not deny that he made this confession, his contentions are:

"That the confession is valueless as evidence against him because it was made by him due to force and intimidation and fear visited upon him by the police authorities, and implied coercion because of the manner in which they kept him in custody from the time of his apprehension until he made this confession. You must find beyond a reasonable doubt that this

confession was a voluntary one before you would have the right to consider it.

" Malinsky then urges a second objection to this confession. His claim is that the statements contained in this confession implicating him in this crime are untrue.

" Under the law, therefore, you will determine, first whether or not this confession is voluntary. If you find it was involuntarily made, or if you have a reasonable doubt about it, then you will disregard the confession entirely. On the other hand, if you find beyond a reasonable doubt that the confession is a voluntary one, you will then determine whether or not the statements inculpating the defendant, therein contained, are true. If you shall have resolved both of these questions in favor of the prosecution, then and only then will you consider the confession in determining the guilt or innocence of the defendant of the crime of murder in the first degree."

We have gone to this length in setting out the facts because it seemed to us necessary to indicate that the most serious of crimes against duly constituted authority had been committed without witnesses; that it was an unsolvable crime if dependence were to be placed upon witnesses or clues; that fate decreed that there should be gathered and thrown together in Sing Sing prison three men who knew of the crime and one of whom, Spielfogel, who knew the most about it, was depending for his wife's support upon one of the active participants in the crime. It is quite evident that when Malinski proved faithless to his agreement, that Spielfogel unburdened himself to Yellin and Kovner but with no intention of acting against Malinski for, curiously enough, testimony is in this record that, after knowledge of what had occurred in the shooting of Fox reached the police department and a lieutenant of police was sent to Sing Sing prison to interview Spielfogel, he refused to talk to the police officer. Even after that police officer had told him all that Spielfogel must have told to Yellin and Kovner he still evinced no interest in helping the police. It was only later that he consented to talk.

One other matter should be mentioned. It is urged upon us that the trial court erred in leaving it to the jury as to whether Spielfogel was an accomplice. It is urged by counsel that the pistols used were pistols supplied by Spielfogel for the com-

mission of this very crime and that we cannot say that a jury could have found that Spielfogel told the truth when he said that the pistols used were Malinski's pistols and not his.

That is not correct. Spielfogel testified that the pistols he had and put in the store where Malinski worked, on the morning of the day of the crime, were pistols that were to be used in connection with another crime to have been committed on Saturday morning or afternoon and that in that other crime there was to have been another participant in addition to himself and Malinski. This court has laid down the sound rule on that question. We can do no better than to quote it. Again we take but a few sentences from *People* v. *Swersky* (216 N. Y. 471, 478, CARDOZO, J.) which seem determinative of this question. "To permit a jury to say that he [Levinson] did join in it, when the only evidence is that he did not, would be to permit them [the jury] to build their verdict upon speculation and suspicion. Levinson, by his own confession, had committed many other crimes. But he did not commit this crime, either in person or by procurement." It may be that it could be argued that a finding by the jury that Spielfogel placed the pistols in the store for use in the robbery at Coney Island, would not be based only upon speculation and suspicion. However, the jury chose to believe Spielfogel's version of the incident. Whether or not we think a contrary finding would be speculative and based on suspicion, the contrary was *not* found and we cannot say that the jury was obligated to find it as a matter of law. Moreover, to find the contrary would be to disregard to a greater or lesser extent the testimony of Eisler.

When all is said and done these defendants had a fair trial and both confessed their guilt to persons other than the police or the District Attorney.

The judgments of conviction should be affirmed.

LEHMAN, Ch. J. (dissenting). Late on the night of February 15, 1941, Leon Fox, a patrolman in the Police Department of the City of New York, was shot, and he died shortly thereafter as a result of bullet wounds. At the time of the shooting the police officer, in the course of his duties, was accompanying the manager of a moving picture theatre who was carrying the day's receipts to a bank. In November, 1942,

more than a year and a half after the shooting the Grand Jury indicted Morris Malinski, Sidney Rudish and Joseph Indovino for "the crime of Murder in the First Degree, committed as follows: The defendants, on or about February 15, 1941, in the County of Kings, acting in concert with Abraham Beitler, deceased, wilfully, feloniously and of malice aforethought shot and killed Leon Fox, with a pistol." The three defendants named in the joint indictment were jointly tried and found guilty. As part of the verdict against the defendant Indovino the jury recommended life imprisonment. No such recommendation was included in the verdict against the defendants Malinski and Rudish. They have appealed to this court. The verdict against Indovino has not been brought up for review to this court.

The testimony of the manager of the moving picture theatre shows that, as he and the police officer were walking toward the bank, a man jumped out of an automobile which was parked at the curb and shot Fox. The manager of the theatre attempted to run away with the bag containing the money he was taking to the bank, but he threw away the bag when the man who had shot the police officer said to him: "Drop the bag, or I'll drop you." The robber picked it up, jumped back into the car and the car sped away. Later during the same night an abandoned car was identified as the car used in the robbery. It had been stolen earlier that night.

No eye witness of the robbery was able to identify the men who took part in it. To connect the defendants with the crime the People produced associates of the defendants who gave testimony of incriminatory statements made by the defendants in furtherance of a conspiracy to rob the manager of the theatre in the Coney Island district of Kings County and, in addition, of incriminatory admissions made thereafter. To prove the guilt of the defendant Malinski, the People introduced, also, a written confession made by Malinski while he was in the custody of the police, but before his arraignment.

David Yellin testified that a few days before February 15, 1941, he was introduced by Beitler, now deceased, to the defendant Indovino. He was told by them about a plan to rob the manager of the moving picture theatre. Indovino was

the author of the plan, but said he would not accompany the others at the robbery because he was too well known in Coney Island. Beitler wanted one Spielfogel, known as " Slip ", to take part in the robbery. Yellin saw Spielfogel the same night, but Spielfogel, distrusting Indovino, refused to go along. Yellin further testified that in the early morning after the holdup he met the defendant Rudish and Rudish told him that he had come back from a " trick " on Coney Island and that Beitler and Malinski had shot a cop. At that time, according to Yellin, Rudish was carrying the " pieces " or guns, which he said had been used in the robbery. The witness Yellin had been committed to Sing Sing on December 12, 1941, upon a sentence of imprisonment for ten to twenty years for robbery while armed with a gun. Nathan Spielfogel had been sentenced to Sing Sing upon a conviction for the same crime to a term of imprisonment of thirty to sixty years. Both were serving their terms when the District Attorney was informed that these men knew who had killed the police officer.

Spielfogel testified that when Yellin spoke to him he had refused to take any part in the robbery because he distrusted Indovino and that on the next day he told Beitler, also, that he would not go along. According to his testimony, Beitler then asked him whether they could use some " pieces " or guns which apparently Beitler thought belonged to Spielfogel, and Spielfogel said:

" Those pieces don't belong to me. They are Malinski's pieces. If he gives them to you, you got them." He testified that at 1:30 on the morning of February 16, 1941, Malinski came to his house and told him that Beitler, Rudish and he had committed the robbery and gave him complete details as to the robbery. He told of other admissions alleged to have been made by Malinsky after the crime and these admissions are corroborated, at least in part, by the testimony of other witnesses. His testimony also implicates Rudish. Rudish, he said, told him early in the evening of February 15th that he, Malinski and Beitler were going to meet at 9 o'clock that night to carry out their conspiracy to rob the manager of the theatre and on the next day, Sunday, February 16th, he again saw Rudish and Rudish gave him full details of what had occurred that night.

The record is devoid of any testimony which tends to connect the defendant Rudish with the crime, other than the testimony of Yellin and Spielfogel. The Trial Judge charged the jury that Yellin was an accomplice as matter of law, for according to his own admissions he aided and abetted the defendants in their conspiracy. The Trial Judge left to the jury as a question of fact whether or not Spielfogel was an accomplice. It is, of course, not disputed that Spielfogel was an associate of the defendants and, according to his own story, he had gone out with them on other "jobs." Nevertheless, he is not an accomplice in the crime of robbery in the commision of which the police officer was killed unless he aided and abetted the defendants in *that* crime. The appellants now urge that his testimony conclusively proves that if the defendants committed the crime, the witness Spielfogel took part in furnishing the "pieces" or guns used in the robbery with knowledge that they were intended for such use. If that is true Spielfogel is an accomplice as matter of law.

These guns, according to the witnesses for the People, were hidden in the toilet connected with the store where Malinski worked and were taken from that toilet by Malinski on the afternoon or early evening of February 15th. Spielfogel admitted that he had put the guns in the store. On cross-examination the following questions were put to him, and he gave the following answers: "Q. Now on your direct examination you said that you put the guns in the store, is that right? A. What do you mean? When they came out of the cellar? Q. I am asking you, did you say that? You said before, 'I put the guns in the store'. Is that what you said? A. In the store? Q. Is that right? A. In the toilet in the store. Q. What? A. In the toilet. Q. You put the guns in the toilet in the store? A. Yes. Q. When was it that you put the guns in the toilet in the store? A. Saturday morning. Q. How many guns did you put in the toilet in the store? A. Four, to be exact. Q. And they were your guns? A. No, sir."

Later he explained that though he went with Malinski to hide the guns "it was not for that particular job," and in answer to a question put to him by the court he said it was in connection with another matter or proposed holdup.

Spielfogel admits he hid guns which, he said, belonged to Malinski, and which were used by the robbers, but he claims that though he knew that Malinski was planning to hold up the theatre manager, yet he did not intend that Malinski should use his own guns in *that* holdup, but should use them in another matter. Except for that explanation of Spielfogel, the other evidence produced by the People would lead irresistibly to the inference that Spielfogel put the guns in the toilet with the purpose of aiding and abetting the " particular job " which was scheduled for that night. In *People* v. *Swersky,* 216 N. Y. 471, 478, the witness had been associated with the defendants in other crimes, but there was, as the court found, *no evidence* of any kind which would " implicate " the witness in the crime with which the defendants were charged or that would " stamp Levinson [the witness] as an accomplice." Here we have evidence from which a reasonable person could hardly fail to draw an inference of guilty participation unless he accepts an explanation of the witness which, I think, calls for credulity possessed only by the naive and perhaps by those who are irked by the statutory rule that a conviction cannot be had upon the testimony of an accomplice " unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime." (Code Crim. Pro. § 399.) In such case what was said and decided in *People* v. *Swersky* (*supra*) has no application. (*People* v. *Feolo,* 282 N. Y. 276.) A finding that Spielfogel was not an accomplice is, I think, clearly contrary to the evidence. That conclusion " disregards ", as the prevailing opinion states, " the testimony of Eisler "; but only because I find nothing in Eisler's testimony which in the slightest degree tends to support an argument to the contrary. The conviction of Rudish thus rests upon the testimony of two witnesses who are accomplices as matter of law or, at least, shown to be accomplices by the great weight of evidence. The Trial Judge charged that no " other evidence " corroborates them. The verdict against Rudish should for that reason be set aside.

The evidence against Malinski is far stronger. The testimony of Yellin and Spielfogel is in his case corroborated by other witnesses who are not accomplices and he has signed a

confession. If his confession is voluntary and was not made under the influence of fear produced by threats, his guilt has indeed been proven to a moral certainty. As to him the question then is whether the confession was admissible under the provisions of section 395 of the Code of Criminal Procedure and whether the defendant Malinski had a fair trial upon that question.

Malinski was taken into custody by two detectives at seven-thirty on the morning of Friday, October 23rd. He was taken, not to police headquarters, but to the Hotel Bossert in Brooklyn. There he was compelled to strip so that the police could see whether there were any scars of bullet wounds on his body. Concededly, after the police had made that inspection he was not permitted to put on his clothes, but was compelled to remain in his " shorts " or " B. V. D's " and a blanket until five-thirty that evening. That afternoon an Assistant District Attorney visited the hotel room and saw that Malinski was being held there without his outer clothing, but apparently did not object. Malinski was kept at the hotel until the afternoon or evening of October 26th except for a visit with the police to a garage where the car used in the robbery was kept. During that time he complained of stomach trouble and asked for a doctor. That request was refused. At the police station to which he was taken on October 26th he was questioned by the District Attorney and then signed the written confession. On the morning of October 27th — four days after the police took him into custody — he was arraigned in court.

This testimony is uncontradicted. The defendant Malinski testified that he was beaten while in the Hotel Bossert and that his confession was extorted from him under the influence of fear. The testimony in regard to the beating by the police is contradicted by the police officers. A question of fact is thus presented whether the confession was admissible under section 395 of the Code of Criminal Procedure.

The Legislature has commanded that " The defendant must in all cases be taken before the magistrate without unnecessary delay ". (Code Crim Pro. § 165.) Here there has been a delay of four days. Except for the delay in arraigning a

person arrested by the police, there would be no room for any claim that a confession made by the accused was extorted by threats or violence. We have said that "the police are guilty of oppression and neglect of duty when they willfully detain a prisoner without arraigning him before a magistrate within a reasonable time. (Code Crim. Pro. § 165.) The conclusion is inescapable that they do this for the purpose of subjecting him to an inquisition impossible thereafter." (*People* v. *Mummiani,* 258 N. Y. 394, 399.) The police lieutenant who was primarily responsible for the delay claimed that though the defendant was seized by the police on the morning of October 23rd, he was not "arrested" until October 26th when he made his written confession and that he was arraigned as soon as possible thereafter. The Legislature has defined arrest as "the taking of a person into custody that he may be held to answer for a crime." Malinski testified, without contradiction, that at 7:30 in the morning of October 23rd two detectives "put guns into my head and they said, ' If you move, I will blow your brains out.' " They then put handcuffs on him and took him to the Hotel Bossert. That the detectives did seize him and take him to the Hotel Bossert is not open to challenge. If the police officers were not exercising at that time their power to arrest, then it is plain that they were committing a crime. If, as appears plain, they did "arrest" the defendant Malinski, then his confinement by the police at the Hotel Bossert, or any other place, without prompt arraignment was contrary to the express command of the statute and was unlawful. We may understand the impatience of police officers at the restrictions imposed upon them by law in obtaining evidence necessary to convict a person of whose guilt they are certain, though the guilt has not at that time been established. Undoubtedly, the unpunished murder, by men intent on crime, of a police officer who has sought to prevent the crime, weakens respect for the law, but lawlessness in law enforcement weakens it no less. Free men for centuries have cherished as an essential part of their liberty the right to prompt arraignment in court when seized by the police. The statute also has commanded that officers of the law shall accord that right to every person they arrest. Invasion of that right cannot be justified

by proof, however convincing, that the person who asserts it is not worthy of his liberty, or that the officers of the law desire only to obtain the evidence required by law to convict men of whose guilt they are convinced.

" An unfair trial, especially in a criminal case, is a reproach to the administration of justice and casts grave responsibility not only upon the prosecuting officer but also upon the trial judge." (*People* v. *Wolf*, 183 N. Y. 464, 472.) The defendants may be depraved creatures who have committed a heinous crime. Nonetheless, until condemned by a jury after a fair trial and upon competent evidence they are entitled to the benefit of the presumption of innocence and to assert all those rights and privileges which have been formulated for the protection of the innocent by the Constitutions of the State and nation, by statutes, and by age old judicial decisions. The courts cannot permit either the prosecuting attorney or the police to decide whether the public interest would be advanced by disregard of the safeguards imposed by law for the protection of an accused. Such safeguards become valueless if they may be violated with impunity when judges or law enforcement officers conclude that otherwise a guilty man might escape punishment.

In this case there can be no doubt that the police officers flagrantly disregarded the provisions of section 165 of the Code of Criminal Procedure by holding the defendant Malinski at the Hotel Bossert and postponing arraignment until after they had obtained a written confession. Their explanation may show that their conduct was due solely to zeal in seeking evidence through which the guilt of the defendants could be established at a trial. It furnishes no justification for their wrong. We are told that even though that may be true and even though the lawless conduct of the police in that respect may have furnished the police with opportunity to obtain the confession, nevertheless, the confession was properly admitted in evidence and could be given weight by the jury if the jury found that it was not induced by fear.

In this State we have repeatedly held that the evidence otherwise competent may not be rejected on the ground that it was obtained by unlawful means. (*People* v. *Defore*, 242 N. Y. 13.)

A confession which is not incompetent under the provisions of section 395 of the Code of Criminal Procedure is not to be rejected because the accused was unlawfully detained by the police without arraignment for the purpose of obtaining the confession. "Neverthless, in determining whether a confession has been obtained as a result of a beating, or is voluntary, the circumstance that it was obtained while arraignment was illegally delayed for no apparent reason except that the police needed a confession in order to have competent proof of the commission of a crime, should be considered by the jury." (*People* v. *Alex,* 265 N. Y. 192, 194.) We must examine the record in this case to determine if there has been a fair trial in this case of the question whether the confession under the circumstances here disclosed was obtained as a result of threats or violence.

The Assistant District Attorney who tried the case has stated in the summation what occurred at the Hotel Bossert while Malinski was being detained there and what effect should, in his opinion, be given by the jury to what there occurred. Without analyzing the testimony to determine the accuracy of what was said in the summation I quote the parts that seem to me most significant:

"* * * Malinski was held and he was allowed to sleep there. He could not get away. When McNally was asked, 'Did you place him under arrest?' he probably meant he did not book him right away. They hold men for several days. Are you satisfied with that? *They are not going to let him go home, or let him get hold of a smart mouthpiece to preach about his rights and sue out writs.* You want a district attorney in this county that is worth his salt, not a powderpuff district attorney. When you are trying a case of murder, especially murder of a police officer, you don't go over and give him a pat on the back and say, 'Do you want anything? Do you want to have your lawyer or your wife or somebody else?' In fact after they would not even let him see Mr. Math, an assistant in our office; they would not even let him talk to a rabbi. Do you think McNally, 17 years in the Police Department is going to let this jerk from the East Side tell him his business? * * *

" * * * Why this talk about being undressed? Of course they had a right to undress him to look for bullet scars, and keep the clothes off him. *That was quite proper police procedure.* That is some more psychology — let him sit around with a blanket on him, *humiliate him there for a while; let him sit in the corner, let him think he is going to get a shellacking.* McNally took one look at him and said, ' Come here ' — just a little tough talk — ' what do you know about it? ' Six o'clock in the evening after he was picked up he told the whole thing." (Italics are mine.)

In a recent case in the Supreme Court of the United States in which a judgment of conviction in a Federal court was challenged on the ground that at the trial a confession was admitted in evidence though obtained while the accused was detained by law enforcement officers in violation of a statute requiring prompt arraignment, the Supreme Court said: " In formulating such rules of evidence for federal criminal trials the court has been guided by considerations of justice not limited to the strict canons of evidentiary relevance. Quite apart from the Constitution, therefore, we are constrained to hold that the evidence elicited from the petitioners in the circumstances disclosed here must be excluded. For in their treatment of· the petitioners the arresting officers assumed functions which Congress has explicitly denied them. They subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding. * * *.

" * * * The purpose of this impressively pervasive requirement of criminal procedure is plain. A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. * * *.

" * * * Legislation such as this, requiring that the police must with reasonable promptness show legal cause for detain-

ing arrested persons, constitutes an important safeguard — not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the ' third degree ' which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement. It outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection. A statute carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application. * * *.

" * * * The record leaves no room for doubt that the questioning of the petitioners took place while they were in the custody of the arresting officers and before any order of commitment was made. Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law. * * *.

" * * * We are not concerned with law enforcement practices except insofar as courts themselves become instruments of law enforcement. We hold only that a decent regard for the duty of courts as agencies of justice and custodians of liberty forbids that men should be convicted upon evidence secured under the circumstances revealed here. In so doing, we respect the policy which underlies Congressional legislation. The history of liberty has largely been the history of observance of procedural safeguards. And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law." (*McNabb* v. *United States*, 318 U. S. 332, at pp. 341–345, and 347.)

We cannot close our eyes to the fact that our frequently and solemnly repeated admonitions to law enforcement officers that they are not above the law and may not in their zeal to obtain convictions hold, without arraignment, persons suspected of crime in order to have opportunity to obtain confessions, are often unheeded.

Perhaps the remedy is by legislation providing that in the courts of this State, as in the Federal courts, evidence obtained by flagrant violation of the rights of the individual must be excluded. However persuasive may be the reasons which have led the Federal courts to adopt that rule, we cannot do so. The contrary rule of evidence has been so long established by repeated decisions of this court and has been the subject of so many debates in the Legislature and in the Constitutional Convention of 1938 that change of the rule now by the court, without legislative sanction, would be an encroachment upon the legislative field. The confession is admissible if the jury find that the confession is not made " under the influence of fear produced by threats." The function of this court in reviewing a judgment resting in part upon a confession, obtained by unlawful means, is confined to the inquiry " whether there has been a fair trial of this issue at which the prosecution has presented testimony which would enable the triers of the fact to determine that issue fairly and truly." (*People* v. *Mummiani, supra,* p. 398.)

Here we are agreed that a finding by the jury that the defendant's confession, though obtained while he was unlawfully detained without arraignment, is not against the weight of the evidence. The officers of the law deny that they beat the defendant or threatened him. Whatever may have been the motive of the police in taking Malinski to the Hotel Bossert instead of to a police station or jail, we find no basis for any inference that the police believed that the hotel was an appropriate place where a person could, without too much risk of discovery, be beaten in order to compel a confession. Nonetheless, in this case, as in *People* v. *Mummiani* (*supra,* pp. 399–400) " the conclusion is inescapable " that the police delayed the arraignment of the defendant " for the purpose of subjecting him to an inquisition impossible thereafter " at which he might be induced to make a confession by resort to what the Supreme Court of the United States has described as " those reprehensible practices known as the ' third degree ' which, though universally rejected as indefensible, still find their way into use." There can be no fair trial of the issue whether the confession is voluntary where the jury is not properly informed that the detention was

unlawful and that they must take that fact into consideration. That has not been done in this case.

It is true that in the charge of the court the jury was informed that "it was the duty of the police to arraign the defendant before the nearest Magistrate without unnecessary delay and further if a police officer fail or refuse to perform such duty, he is guilty of a misdemeanor," and that "*if* you should find that the arraignment of the defendant was delayed, you may consider that on the question of the voluntariness of any confession made by Malinski, including the one made in the early hours of October 27th at the Bath Beach station house." That instruction is not sufficient where, as in this case, the evidence produced by the People conclusively shows that the police flagrantly disobeyed the express mandate of the law. Even if there had been question in this case that the delay in arraignment was not "unnecessary" within the meaning of section 165 of the Code of Criminal Procedure, that question was not properly submitted to the jury. I have quoted what the Assistant District Attorney told the jury in his summation. The jury was urged to find that the police act properly when they hold a suspect incommunicado in order to induce him to incriminate himself before he can "get a smart mouthpiece to preach about his rights and sue out writs." Worse than that the jury was informed that it was "quite proper police procedure" to keep a man undressed for hours in order to "let him think he is going to get a shellacking" and thus perhaps to obtain a confession "under the influence of fear induced by threats," even though the threats be implied rather than expressed.

Failure of counsel to interrupt the summation by objection to these remarks, though counsel did interrupt by objection to other statements, indicates, it is urged, that these comments of the District Attorney did not seem important to counsel. Counsel did, however, move at the close of the summation for a mistrial because of these statements, and the trial court in denying the motion failed to indicate in any way that there was no justification for the comments of the District Attorney and that the jury must disregard them.

The prosecuting attorney is an officer of the State and he speaks to the jury with added weight because of his office. His

remarks here went unrebuked by the court and the jury was not informed even that if the defendant made his confession because he believed he might " get a shellacking " it would be inadmissible. We are loath to believe that the police did actually act as the Assistant District Attorney says they did. We certainly cannot say that the police did not do so and we should not hesitate to reverse a judgment which is the result of a trial at which the jury was led to believe that such practices were lawful and proper. A great citizen and a great jurist has said:

" An expert Bar, tenacious of its rights and also aware of their limitations can aid the courts by keeping within the lines and by not attempting to play off-side. Let us not talk simply of rules of procedure in the desire to obtain the appropriate punishment of crime and the enforcement of law, but make it our concern that trials of criminal cases shall be less a game to please the spectators than a serious and successful effort to deal promptly and efficiently with a precise charge with no right infringed and no nonsense tolerated.

" Liberty and law — one and inseparable! The noblest endeavor of democracy to safeguard the one by intelligence in the other! " (Presidential address of Charles Evans Hughes to the American Bar Association, 1925.)

The judgment should be reversed and a new trial ordered.

LEWIS, DESMOND and THACHER, JJ., concur with CONWAY, J.; LEHMAN, Ch. J., dissents in opinion in which LOUGHRAN and RIPPEY, JJ., concur.

Judgments of conviction affirmed. (See 292 N. Y. 686.)