STATE OF CONNECTICUT *v.* ANONYMOUS (1972–3)*

CIRCUIT COURT

JACOBS, J. An assistant prosecuting attorney for the Circuit Court, accompanied by members of a municipal police department, entered the defendant's place of business and searched and seized, without a search or seizure warrant, a large quantity of magazines, a long list of which was introduced at the evidentiary hearing. The police report, also introduced into evidence, recites that the prosecutor

* Opinions on preliminary motions in criminal cases are thus entitled, in view of General Statutes § 54-90.

and detectives went to investigate a complaint that obscene books and magazines were being sold. Once inside the store, they looked around and picked out four magazines. It was determined by the prosecutor that these magazines were obscene. A detective then bought the magazines from the owner and operator, the accused. The total of the four was $22.37. A written receipt was then given to the detective for the magazines. It was at this time that he placed the accused under arrest, after having identified himself. As soon as the accused was placed under arrest, he was informed of his rights. The approximate amount of the items seized was $3102.60. Also seized was $107.

The defendant was charged with a violation of § 53a-194 of the Penal Code, which provides as follows: "(a) A person is guilty of obscenity when, knowing its content and character, he promotes, or possesses with intent to promote, any obscene material or performance." Obscenity is a class B misdemeanor.

The claim on the motion to suppress, to use the language contained in the motion, is: "The entrance [into the defendant's place of business] was made without any legal process, without a warrant of search and seizure, without any sort of semblance of warrant or authority issued out of a judicial office, and without express or implied permission of any person on the premises." In other words, the basic claim is that the procedure preceding the search and seizure was constitutionally deficient.

"The history of American freedom is, in no small measure, the history of procedure." *Malinski* v. *New York,* 324 U.S. 401, 414 (separate opinion). While this comment was made in the context of criminal procedure, courts have come to realize that procedural guarantees play an equally large role in

protecting freedom of speech; indeed, they "assume an importance fully as great as the validity of the substantive rule of law to be applied." *Speiser* v. *Randall*, 357 U.S. 513, 520. Responding to this realization, courts have begun to construct a body of procedural law which defines the manner in which they and other bodies evaluate and resolve first amendment claims—that is, first amendment "due process." It is in the obscenity area that the courts have been most concerned with procedural matters. Here the Supreme Court of the United States has fashioned a series of specific rules designed to prevent insensitive procedural devices from strangling first amendment interests. The court has found itself developing a comprehensive system of "procedural safeguards designed to obviate the dangers of a censorship system." *Freedman* v. *Maryland*, 380 U.S. 51, 58. Rather than attempting to apply the traditional requirements of due process to obscenity determinations, the Supreme Court has judged the adequacy of procedures by a different standard: Does the procedure show "the necessary sensitivity to freedom of expression?" Ibid. Central to first amendment due process is the notion that a judicial, rather than an administrative, determination of the character of the speech is necessary. *Manual Enterprises, Inc.* v. *Day*, 370 U.S. 478, contains the first clear suggestion that, by virtue of the first amendment itself, courts alone are competent to decide whether speech is constitutionally protected.

In *Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, a case challenging the activities of a state obscene literature commission, the commission exerted considerable informal pressure on local retailers to withdraw objectionable literature from their newsstands. The commission's activities ranged from vigorous "advice" to the local retailers to threats of criminal prosecution. The Supreme Court held that the com-

mission's conduct amounted to an unconstitutional prior restraint. In condemning this procedure, the court referred to two particular deficiencies: (1) there was no provision for "judicial superintendence" of the commission's activities; and (2) there was no assurance of immediate judicial determination of the validity of any administratively imposed restraint. The net result was, therefore, that an administrative agency rather than a court was imposing a final restraint on speech. *Bantam Books* strongly intimated that the first amendment forbids this. "The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." *Freedman* v. *Maryland,* 380 U.S. 51, 58. The preference for judicial evaluation of first amendment claims rests upon the most fundamental considerations—the inherent institutional differences between courts and administrative agencies, no matter how judicial the administrative agencies may be. Professor Hart has observed that the "structure of American institutions" predestined courts "to be a voice of reason, charged with the creative function of discerning afresh and of articulating and developing impersonal and durable principles . . . ." Hart, "The Time Chart of the Justices," 73 Harv. L. Rev. 84, 99. These considerations are of paramount importance when first amendment interests are at stake. Courts alone are institutionally able consistently to discern, and to apply, the values embodied in the constitutional guarantee of freedom of speech. See Bickel, Least Dangerous Branch: The Supreme Court at the Bar of Politics, pp. 25–26.

If this court were to adopt and follow the argument advanced by the state, law enforcement officers, however well intentioned and acting in good faith,

would have virtually unlimited authority to seize any publications which they consider obscene, and without prior submission of any publications whatever to an impartial judicial officer. See *Marcus* v. *Search Warrant of Property*, 367 U.S. 717. One of the most serious problems in the enforcement of our antiobscenity statute, and similar statutes throughout the country, has been the confines of what is permitted as free speech under the first amendment. So serious a matter cannot be left to the determination of law enforcement officers. It would simplify the administration of the law if that whole function could be delegated to the discretion of law enforcement officers in the locality involved, but if that were done, there would be as many different standards of what constitutes obscenity as there are policemen. See *People* v. *Rothenberg*, 20 N.Y.2d 35, 38.

Mass seizure of magazines and material, as in this case, without judicial intervention of any kind is far more repressive than civil injunctive procedures designed to prevent further sale of books or magazines. Long ago, Blackstone acknowledged the importance of an adjudicatory procedure as a protection against the suppression of inoffensive publications. See 4 Blackstone, Commentaries *151–52.

This court is of the opinion that the procedures as applied in this case lacked the safeguards which procedural due process demands to assure nonobscene material the constitutional protection to which it is entitled. No opportunity was afforded the defendant to elicit and contest the reasons underlying the law enforcement officer's belief, or otherwise to argue against the propriety of the seizure; the seizure was made and effected on the strength of the conclusory assertions of a single assistant prosecuting attorney, without any scrutiny by a judge of any of the materials considered to be obscene. It is no reflection on the good faith or judgment of the

police officers; they were merely carrying out the task to which they were assigned.

The procedures followed in the case at bar sweep so broadly and with so little discrimination that they constitute deficient constitutional techniques required by the due process clause to prevent erosion of constitutional guarantees.

This court concludes, upon the authority of *Marcus* v. *Search Warrant of Property,* 367 U.S. 717, and *A Quantity of Books* v. *Kansas,* 378 U.S. 205, that indiscriminate mass seizure of the magazines violates constitutional requirements because the fashion by which the seizure was effected was without any safeguards to protect legitimate expression. Moreover, the procedure which was followed here not only amounted to a general search of thousands of titles in the defendant's stock but also constituted a prior restraint on any publication that the police officers determined in their search to confiscate.

It must be strongly emphasized that this court does not reach and therefore does not pass upon the merits of the issues. The court intimates no view upon the question whether the magazines and materials in question are obscene. This court has strictly confined this opinion to the procedures which were followed and which the court holds were constitutionally insufficient.

And finally, obscene books may not be treated as contraband as are narcotics, gambling paraphernalia and other types of contraband. That proposition was explicitly rejected in *Marcus* v. *Search Warrant of Property,* 367 U.S. 717, 730–31; see note, 26 Missouri Law Rev. 501.

The defendant's motion to suppress the evidence and for the return of the property illegally seized must be and hereby is granted for reasons set forth herein.